Austin v. Regal Inv. Advisors, LLC, 2018 NCBC 3.

STATE OF NORTH CAROLINA

ORANGE COUNTY

DIANE AUSTIN; WILLIAM AUSTIN;
LISA GWYTHER; ROBERT
GWYTHER; RONALD SHELTON;
and VERONICA DALE SHELTON,

Plaintiffs,

v.

REGAL INVESTMENT ADVISORS,
LLC and JAMES MARTIN "MARTY"
BARNES,

Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
17 CVS 309

**ORDER AND OPINION ON
DEFENDANT REGAL INVESTMENT
ADVISORS, LLC'S MOTION TO
DISMISS**

1.     **THIS MATTER** is before the Court on Defendant Regal Investment Advisors, LLC's ("Regal" or "Defendant") Motion to Dismiss (the "Motion").  Having considered the Motion, the briefs, and the arguments of counsel at a hearing on the Motion, the Court hereby **GRANTS in part** and **DENIES in part** the Motion.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, by Clint S. Morse and Jessica Thaller-Moran, for Plaintiffs.*
>
> *Jackson Lewis, P.C., by Paul S. Holsher, Caitlin M. Goforth, and Kevin D. Holden, for Defendant Regal Investment Advisors, LLC.*
>
> *Graebe Hanna & Sullivan, PLLC, by Christopher T. Graebe, and O'Hagan Meyer, PLLC, by H. Robert Yates, III, for Defendant James Martin "Marty" Barnes.*

Robinson, Judge.

# I. PROCEDURAL HISTORY

2. The Court sets forth here only those portions of the procedural history that are relevant to its determination of the Motion.

3. Plaintiffs initiated this action by filing their Complaint on March 20, 2017.

4. This case was designated as a mandatory complex business case by order of the Chief Justice of the Supreme Court of North Carolina dated June 19, 2017 and assigned to the undersigned by order of Chief Business Court Judge James L. Gale dated June 21, 2017.

5. On August 16, 2017, Regal filed the Motion pursuant to Rule 12(b)(6) of the North Carolina Rules of Civil Procedure ("Rule(s)") and its supporting brief.

6. On November 14, 2017, the Court held a hearing on the Motion at which counsel for all parties were present.

7. The Motion has been fully briefed and is now ripe for resolution.

# II. FACTUAL BACKGROUND

8. The Court does not making findings of fact on the Motion under Rule 12(b)(6) but only recites those factual allegations of the Complaint that are relevant and necessary to the Court's determination of the Motion.

## A. The Parties

9. Regal is a Michigan limited liability company that operates as an investment adviser registered with the Securities Exchange Commission ("SEC"). (Compl. ¶¶ 7, 9, ECF No. 5.) In 2010, Regal provided the North Carolina Secretary

of State's Securities Division with the documentation necessary for it to engage in investment advising in North Carolina. (Compl. ¶ 10.)

10. Defendant James Martin "Marty" Barnes ("Mr. Barnes") has worked as a registered investment adviser representative with various firms since 1980 and became an investment adviser representative for Regal in either 2011 or 2012. (Compl. ¶¶ 13, 22–23, 25.)

11. Plaintiffs Lisa Gwyther ("Mrs. Gwyther") and Robert Gwyther ("Mr. Gwyther") (collectively, "the Gwythers") are North Carolina citizens who became clients of Mr. Barnes in 1990. (Compl. ¶¶ 3–4, 21.)

12. Plaintiffs Veronica Dale Shelton ("Mrs. Shelton") and Ronald Shelton ("Mr. Shelton") (collectively, "the Sheltons") are North Carolina citizens who became clients of Mr. Barnes in 2012. (Compl. ¶¶ 5–6, 21.)

13. Plaintiffs Diane Austin ("Mrs. Austin") and William Austin ("Mr. Austin") (collectively, "the Austins") are North Carolina citizens who became clients of Mr. Barnes in the spring of 2013. (Compl. ¶¶ 1–2, 21.)

## B. Mr. Barnes Joins Regal

14. Mr. Barnes began working for Regal at some point between 2011 and 2012, at which time each of his then current clients signed Regal's Client Investment Advisory Agreement (the "Advisory Agreements"). (Compl. ¶¶ 13, 25–26, Ex. A.)

15. By executing the Advisory Agreements, Plaintiffs as clients each established an investment account with Regal and appointed Regal as its investment adviser and investment manager "to supervise and direct the investments of the

[a]ccount(s) in accordance with the [c]lient's stated objectives and financial goals." (Compl. Ex. A, § 1.) The Advisory Agreements gave Regal, as investment manager, "full discretion to supervise, manage, and direct the assets" in each client's accounts "in any manner deemed appropriate and to place all orders for the purchase and sale of [a]ccount assets with or through brokers, dealers, or issuers . . . selected by [Regal] or as directed by the [c]lient . . . subject to any restrictions imposed by the [c]lient in the [c]lient [d]ocumentation[.]" (Compl. Ex. A, § 1, at 1–2.)

16. The Advisory Agreements also contained a disclaimer of liability: "It is agreed that except for negligence, malfeasance or violation of applicable law, neither [Regal] nor any of its officers, directors or employees shall be liable for any action performed or for any errors of judgment in managing client's account(s) under this Agreement." (Compl. Ex. A, § 4.)

17. In addition to the Advisory Agreements, the Complaint references Regal's Investment Policy Statement (the "Policy Statement"), "a comprehensive, client-specific and dynamic document" used to achieve certain objectives. (Compl. Ex. B, Part II.) As part of the Policy Statement, each client was provided a questionnaire used to determine the client's risk tolerance. (Compl. Ex. B, Part I.) The Policy Statement also delineated the roles and responsibilities of Regal and its investment adviser representatives. (Compl. Ex. B, Part III.) Mr. Barnes, as the investment adviser representative, was "responsible for selecting the appropriate portfolio model" for each client, reviewing the investment process and results with each client on an ongoing basis, and making portfolio adjustments when a client's circumstances

or objectives changed. (Compl. Ex. B, Part III.) Regal was to provide discretionary portfolio management services to its clients through ongoing partnerships with investment adviser representatives. (Compl. Ex. B, Part III.) Further, the Policy Statement set out Regal's principles for making investment decisions, which included professional oversight and "active/tactical management" of each portfolio. (Compl. Ex. B, Part IV.)

## C. The Triton Investment

18. In March and April 2014, Mr. Barnes contacted each Plaintiff separately and informed them of a new investment opportunity that he claimed would increase their returns without increasing their risk. (Compl. ¶ 42a.) Mr. Barnes explained that the investment would require Plaintiffs to place their account assets in self-directed investment retirement accounts through Equity Trust, which assets would then be invested in Triton Sitework Development, LLC ("Triton"), a North Carolina site development and construction company of which Mr. Barnes was a co-owner. (Compl. ¶¶ 42f, 58.) According to Mr. Barnes, Plaintiffs' retirement accounts would be provided to Triton as a loan, in exchange for which Plaintiffs would receive promissory notes bearing interest at a daily rate equal to 12% per annum. (Compl. ¶ 42g.) Mr. Barnes told Plaintiffs that Mezzanine Partners, LLC would serve as the administrative agent for the loans. (Compl. ¶ 43b.) Mr. Barnes further told Plaintiffs that the money loaned to Triton was for general business uses and that Triton had contracted to perform $45 million of work, causing it to need additional capital to meet its business growth. (Compl. ¶ 43a, c.)

19.     Plaintiffs allege that Mr. Barnes informed each Plaintiff that the new investment was not risky or speculative, that it was "very secure," and that there was no risk of losing their principal investment. (Compl. ¶ 43e.) Mr. Barnes also represented that he "personally knew the people running Triton and trusted them." (Compl. ¶ 43d.) Additionally, Plaintiffs allege that Mr. Barnes made the following specific representations to Plaintiffs:

- Mr. Barnes told the Austins that their investment was not at risk because Triton owned equipment that could be sold to pay back investors within thirty days. (Compl. ¶ 43b.)

- Mr. Barnes told the Sheltons that their principal investment would never be lost because they could always recover it within thirty days and that the only element of their investment that could be less than promised was the amount of the interest payments. (Compl. ¶ 43c.)

- Mr. Barnes told the Gwythers that Triton had a track record of success, that insurance had been purchased to cover potential losses, and that the investment would eliminate the inherent fluctuations of general equity markets. (Compl. ¶ 43d.)

Plaintiffs aver that Triton was already in severe financial distress when Mr. Barnes made these representations to Plaintiffs. (Compl. ¶ 46.)

20.     Plaintiffs allege that they were neither sophisticated investors nor had the business acumen to determine the appropriateness of their investments in Triton and that they invested in Triton based on Mr. Barnes's representations. (Compl. ¶¶ 38,

44, 71.) The Austins and the Gwythers each invested approximately $100,000 in Triton in March 2014, and the Gwythers invested an additional $170,000, approximately, on May 12, 2014. (Compl. ¶ 44a–b.) The Sheltons invested approximately $200,000 in Triton on April 22, 2014. (Compl. ¶ 44c.) In exchange, each Plaintiff was given a promissory note with a maturity date of at least fifteen months. (Compl. ¶¶ 42g, 45.)

21. After some of the Plaintiffs received initial interest payments from Triton, all interest payments stopped. (Compl. ¶¶ 48–49.) Throughout the latter half of 2015, Plaintiffs spoke with Mr. Barnes about the Triton investment and were given various assurances. (*See* Compl. ¶¶ 50–54.) Mr. Barnes told Mr. Austin that Triton was "being bought by a 'bigger fish'" and that Mr. Austin's funds would be returned to him once the sale was finalized. (Compl. ¶ 50.) Mr. Barnes told the Sheltons and the Austins that Triton's work was delayed due to inclement weather, but that interest payments would resume soon. (Compl. ¶¶ 51, 53.) Mr. Barnes also told the Sheltons and the Austins that Triton had taken on more work than it could handle and was attempting to sell some of its work to a different construction company, again assuring Plaintiffs that they would receive overdue interest payments soon. (Compl. ¶ 52.) In late 2015, the Sheltons asked Mr. Barnes if they would need to seek legal remedies regarding the Triton investment and were told by Mr. Barnes "that if it came to that, insurance would cover the losses." (Compl. ¶ 54.)

22. Plaintiffs allege that, at the time Mr. Barnes made these representations, Triton was already in the process of closing down, a fact which Mr. Barnes "could

have known" because he was a co-owner of Triton. (Compl. ¶¶ 55, 58.) In early 2016, Triton had already closed its principal office and disconnected the office telephone. (Compl. ¶ 56.) Plaintiffs lost the entirety of their investments in Triton, as well as the income stream provided for in the promissory notes. (Compl. ¶ 62.)

### D. Regal Terminates Mr. Barnes

23. In March 2016, Regal's chief compliance officer sent Plaintiffs a letter explaining that Mr. Barnes had been terminated from Regal. (Compl. ¶ 63.) The letter claimed that it was only after Mr. Barnes's termination that Regal became aware that Mr. Barnes "previously solicited individuals to transfer funds to Equity Trust to purchase investments that Regal did not know about, approve or offer." (Compl. ¶ 63.)

24. The Complaint alleges that Plaintiffs, based on the Advisory Agreements and Policy Statement, believed that Regal oversaw all of Mr. Barnes's actions and ensured that Plaintiffs' investments were consistent with their goals, objectives, and investment profiles. (Compl. ¶¶ 75–76.) The Complaint further alleges that Regal failed to properly monitor and supervise Plaintiffs' investment accounts and the conduct of Mr. Barnes. (Compl. ¶ 83a–b.) Plaintiffs aver that Regal could have discovered Mr. Barnes's improper investments because Mr. Barnes regularly discussed the Triton investment with Plaintiffs using his Regal e-mail account, Plaintiffs' investments were effected through wire transfers from their Regal accounts, and Plaintiffs' investment reports were available for Regal's inspection. (Compl. ¶¶ 77–80.)

### E. Plaintiffs' Claims

25. Plaintiffs assert eleven claims for relief, some of which are brought against both Regal and Mr. Barnes and some of which are brought solely against Regal. Specifically, Plaintiffs bring claims against Regal and Mr. Barnes for negligence (Counts II and V), breach of fiduciary duty (Count III), negligent misrepresentation (Count IV), violations of the North Carolina Securities Act ("NCSA"), N.C. Gen. Stat. § 78A-56(a)(2), (Count VI), and violations of the North Carolina Investment Advisors Act ("NCIAA"), N.C. Gen. Stat. §§ 78C-8, 78C-38, (Count VIII). (Compl. 15, 17–19.) Plaintiffs assert claims against Regal for breach of contract (Count I), control person liability under the NCSA, N.C. Gen. Stat. § 78A-56(c)(1), (Count VII), control person liability under the NCIAA, N.C. Gen. Stat. § 78C-38, (Count IX), *respondeat superior* (Count X), and negligent supervision (Count XI). (Compl. 14–15, 17–21.) Regal seeks dismissal of all eleven claims brought against it. (Def. Regal Inv. Advisors, LLC's Mot. Dismiss 1, ECF No. 29.)

### III. LEGAL STANDARD

26. In ruling on Regal's 12(b)(6) Motion, the Court reviews the allegations of the Complaint in the light most favorable to Plaintiffs. The Court's inquiry is "whether, as a matter of law, the allegations of the complaint, treated as true, are sufficient to state a claim upon which relief may be granted under some legal theory." *Harris v. NCNB Nat'l Bank of N.C.*, 85 N.C. App. 669, 670, 355 S.E.2d 838, 840 (1987). The Court construes the Complaint liberally and accepts all allegations as true. *Laster v. Francis*, 199 N.C. App. 572, 577, 681 S.E.2d 858, 862 (2009).

27. Where the Complaint refers to and depends on certain documents, the Court may consider those documents without converting the motion into one for summary judgment under Rule 56. *Schlieper v. Johnson*, 195 N.C. App. 257, 261, 672 S.E.2d 548, 551 (2009). At the same time, the Court may not consider materials that are not mentioned, contained, or attached in or to the pleading; otherwise, a Rule 12(b)(6) motion will be converted into a Rule 56 motion and subject to its standards of consideration and review. *Fowler v. Williamson*, 39 N.C. App. 715, 717, 251 S.E.2d 889, 890–91 (1979).

28. Dismissal of a claim pursuant to Rule 12(b)(6) is proper "(1) when the complaint on its face reveals that no law supports [the] claim; (2) when the complaint reveals on its face the absence of fact sufficient to make a good claim; [or] (3) when some fact disclosed in the complaint necessarily defeats the . . . claim." *Oates v. JAG, Inc.*, 314 N.C. 276, 278, 333 S.E.2d 222, 224 (1985); *see also Jackson v. Bumgardner*, 318 N.C. 172, 175, 347 S.E.2d 743, 745 (1986). Otherwise, "a complaint should not be dismissed for insufficiency unless it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Sutton v. Duke*, 277 N.C. 94, 103, 176 S.E.2d 161, 166 (1970) (emphasis omitted).

29. The Court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Good Hope Hosp., Inc. v. N.C. Dep't of Health & Human Servs.*, 174 N.C. App. 266, 274, 620 S.E.2d 873, 880 (2005). A "trial court can reject allegations that are contradicted by the documents attached, specifically referred to, or incorporated by reference in the

complaint." *Laster*, 199 N.C. App. at 577, 681 S.E.2d at 862. The Court can also ignore a party's legal conclusions set forth in its pleading. *McCrann v. Pinehurst, LLC*, 225 N.C. App. 368, 377, 737 S.E.2d 771, 777 (2013).

## IV.    ANALYSIS

### A.    Breach of Contract (Count I)

30.    The elements for a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract. *Poor v. Hill*, 138 N.C. App. 19, 26, 530 S.E.2d 838, 843 (2000); *see also Edwards v. PFA Architects, P.A.*, 2017 NCBC LEXIS 56, at *10 (N.C. Super. Ct. June 29, 2017).

31.    The allegations of the Complaint are sufficient to state that a valid contract existed between Plaintiffs and Regal. The Complaint alleges that Plaintiffs entered into the Advisory Agreements with Regal, (Compl. ¶ 26), pursuant to which Plaintiffs appointed Regal to supervise and manage their investment accounts in accordance with their objectives and financial goals, (Compl. Ex. A, § 1). The Complaint sufficiently alleges that Regal breached the Advisory Agreements by failing to monitor Plaintiffs' investment accounts and Mr. Barnes's conduct, (Compl. ¶ 83a–b), thus allowing Plaintiffs' assets to be invested in Triton, an investment that was inconsistent with Plaintiffs' stated objectives and goals, (Compl. ¶ 67). Plaintiffs allege that Mr. Barnes presented the Triton investment opportunity to Plaintiffs in March and April 2014, (Compl. ¶ 43), and Plaintiffs invested in Triton between March and May 2014, (Compl. ¶ 44). However, the Complaint alleges that Regal did not become aware that Mr. Barnes had induced Plaintiffs to invest in the Triton

opportunity until March 2016, approximately two years after Plaintiffs invested therein. (Compl. ¶ 63.) The Complaint also alleges that had Regal properly supervised Plaintiffs' accounts, it could have discovered the improper Triton investment sooner by monitoring Mr. Barnes's company e-mail, wire transfers from Plaintiffs' Regal accounts, or Plaintiffs' investment reports. (Compl. ¶¶ 77–80.) The Court concludes that, at the pleading stage, these allegations are sufficient to state that Regal failed to manage and supervise Plaintiffs' accounts in breach of the Advisory Agreements. Based on the foregoing, the Court concludes that Plaintiffs have adequately alleged a claim for breach of contract.

32. Regal argues that Plaintiffs expressly waived the right to assert a breach of contract claim against Regal based on the disclaimer of liability in the Advisory Agreements. (Mem. Law Supp. Def. Regal Inv. Advisors, LLC's Mot. Dismiss 6, ECF No. 30 ["Def. Regal's Br. Supp."].) Regal also argues that Plaintiffs were no longer subject to the Advisory Agreements once they voluntarily transferred their account assets from Regal-managed accounts to self-directed IRAs not associated with Regal. (Def. Regal's Br. Supp. 7.) Plaintiffs respond that Regal's complete failure to supervise and direct Plaintiffs' investments amounted to a breach of Regal's contractual obligations, not an error in judgment so as to implicate the disclaimer of liability. (Pls.' Br. Opp'n Regal's Mot. Dismiss 9, ECF No. 43.)

33. The provision of the Advisory Agreements at issue here states that Regal may not be liable "for any action performed or for any errors of judgment in managing client's account(s)." (Compl. Ex. A, § 4.) Plaintiffs allege a complete failure by Regal

to supervise and manage Plaintiffs' investment accounts as promised. Rather than alleging that Regal breached the contract by an "action performed" or "error of judgment," Plaintiffs allege a complete absence of performance or the exercise of any judgment. Therefore, the Court cannot conclude as a matter of law, based solely on the pleadings, that the exculpatory provision defeats Plaintiffs' breach of contract claim.

34. As to Regal's argument that it had no obligation to supervise Plaintiffs' assets once they were taken out of Regal-managed accounts, the Court does not interpret Plaintiffs' allegations to charge Regal with a duty to supervise assets of clients who have ended their relationship with Regal. However, here, the Complaint alleges that Regal's breach occurred when Regal failed to supervise Plaintiffs' accounts so as to allow Mr. Barnes to invest Plaintiffs' assets in Triton in the first place—when the assets were still in Regal accounts and subject to Regal's supervision and management. (*See* Compl. ¶ 90.)

35. Taking all facts and reasonable inferences in Plaintiffs' favor, as the Court must at this stage of the litigation, the Court concludes that Plaintiffs have stated a claim against Regal for breach of contract by adequately alleging that Regal breached its contractual obligations to supervise and monitor Plaintiffs' accounts and make investments in accordance with Plaintiffs' stated objectives and goals. The Motion is, therefore, denied as to Plaintiffs' breach of contract claim.

## B. Breach of Fiduciary Duty (Count III)

36. "For a breach of fiduciary duty to exist, there must first be a fiduciary

relationship between the parties." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001). A fiduciary relationship "exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence." *Lockerman v. S. River. Elec. Membership Corp.*, 794 S.E.2d 346, 351 (N.C. Ct. App. 2016). "In North Carolina, a fiduciary duty can arise by operation of law (*de jure*) or based on the facts and circumstances (*de facto*) . . . ." *Id.* *De jure* fiduciary duties arise because of a legal relationship between the parties, such as the relationship between an attorney and his client. *White v. Consol. Planning, Inc.*, 166 N.C. App. 283, 293, 603 S.E.2d 147, 155 (2004).

37. Regal contends that Plaintiffs' breach of fiduciary duty claim should be dismissed because (1) North Carolina has not recognized a *de jure* fiduciary relationship between an investment adviser and its clients; (2) Regal did not stand in a *de facto* fiduciary relationship with Plaintiffs and, thus, did not owe Plaintiffs any duties beyond those specified in the Advisory Agreements; and (3) even assuming the existence of a fiduciary relationship, Plaintiffs have not alleged facts to support a finding that Regal breached any fiduciary duties it may have owed to Plaintiffs. (Def. Regal's Br. Supp. 9–10.)

38. As to Regal's first argument, the Court believes it can properly resolve the Motion as to Plaintiffs' breach of fiduciary duty claim without determining whether a *de jure* fiduciary relationship exists between an investment adviser and its clients under North Carolina law. Under the allegations of the Complaint, the Court believes

Plaintiffs have adequately alleged the existence of a *de facto* fiduciary relationship and the breach of the fiduciary duties arising therefrom.

39. Because our "[c]ourts have historically declined to offer a rigid definition of a fiduciary relationship in order to allow imposition of fiduciary duties where justified[,]" fiduciary relationships "can arise in a variety of circumstances, and may stem from varied and unpredictable facts." *HAJMM Co. v. House of Raeford Farms, Inc.*, 328 N.C. 578, 588, 403 S.E.2d 483, 489 (1991). However, "[t]he standard for finding a *de facto* fiduciary relationship is a demanding one[.]" *Lockerman*, 794 S.E.2d at 342. "Only when one party figuratively holds all of the cards – all of the financial power or technical information, for example – have North Carolina courts found that the special circumstance of a fiduciary relationship has arisen." *S.N.R. Mgmt. Corp. v. Danube Partners 141, LLC*, 189 N.C. App. 601, 613, 659 S.E.2d 442, 451 (2008). "Determining whether a fiduciary relationship exists requires looking at the particular facts and circumstances of a given case." *Highland Paving Co. v. First Bank*, 227 N.C. App. 36, 42, 742 S.E.2d 287, 292 (2013). Thus, whether a *de facto* fiduciary relationship exists "is generally a question of fact for the jury." *Lockerman*, 794 S.E.2d at 351.

40. The Complaint alleges that Plaintiffs, none of whom were sophisticated investors, (Compl. ¶ 38), had come to rely on Mr. Barnes and Regal for their financial expertise, (Compl. ¶¶ 41, 75–76, 99). The Complaint further alleges that Plaintiffs reposed special confidence in Regal and Mr. Barnes "to look out for their interests because of that expertise[,]" (Compl. ¶ 99), and points to provisions in the agreements

between the parties pursuant to which Regal had discretionary authority to direct investment of Plaintiffs' funds and was to supervise their accounts, (Compl. ¶¶ 27–30, 34–36, 76, 84, Ex. A, § 1, Ex. B, Parts III–IV).

41.     While it is true that parties to a contract generally "owe no special duty to one another beyond the terms of the contract," *Branch Banking & Tr. Co. v. Thompson*, 107 N.C. App. 53, 61, 418 S.E.2d 694, 699 (1992), the mere fact that parties entered into a contract does not, as a matter of law, foreclose the existence of a relationship of trust and confidence sufficient to impose fiduciary duties on Regal. The facts of this case bear similarities to *White v. Consolidated Planning, Inc.*, 166 N.C. App. 283, 603 S.E.2d 147 (2004). In *White*, plaintiffs' son worked for defendant-company, which offered financial planning services and acted as a general agent for insurance companies. *Id.* at 288, 603 S.E.2d at 152. After plaintiffs used their retirement savings to buy insurance and annuity products from their son, as an employee and agent of defendant-company, the son took funds from plaintiffs' annuities for his own use and engaged in conduct designed to hide his actions, including creating fictitious account statements and changing plaintiffs' mailing address on the account to his own office address so that plaintiffs would not receive accurate account statements. *Id.* at 288–89, 603 S.E.2d at 152–53. Defendant later terminated plaintiffs' son when it learned he had been misappropriating clients' funds, but did not investigate plaintiffs' accounts to determine whether their son had stolen from them. *Id.* at 290, 603 S.E.2d at 153.

42.     The Court of Appeals reversed the trial court's dismissal of plaintiffs' breach of fiduciary duty claim. *Id.* at 311, 603 S.E.2d at 166. The Court of Appeals found the allegations that plaintiffs relied upon their son and defendant to properly manage their funds because of plaintiffs' lack of expertise in financial affairs, together with the facts and circumstances set forth in the complaint, adequate to plead the existence of a fiduciary relationship. *Id.* at 293–94, 603 S.E.2d at 155.

43.     The Court concludes that the Complaint's allegations regarding the relationship between the parties, the amount of discretion given to Mr. Barnes and Regal to manage Plaintiffs' investments, and the circumstances of the Triton investment, together with the allegations that Plaintiffs, who were not sophisticated investors, relied on Mr. Barnes and Regal for their financial expertise to manage their investment accounts, are sufficient at the Rule 12(b)(6) stage to plead the existence of a *de facto* fiduciary relationship.

44.     Regal next argues that the Complaint fails to allege sufficient facts that Regal breached any fiduciary duties it may have owed to Plaintiffs. (Reply Mem. Law Supp. Def. Regal Inv. Advisors, LLC's Mot. Dismiss 4–5, ECF No. 48 ["Def. Regal's Reply Br."].) Regal argues that Plaintiffs repudiated the benefit of any fiduciary duty owed to them by Regal when they took an active role in investing in Triton, knowing that Mr. Barnes's advice was not being made on Regal's behalf because such an investment was contrary to Regal's interest as it required removing Plaintiffs' assets from Regal accounts. (Def. Regal's Reply Br. 4–5.) The facts alleged in the Complaint, however, do not support that Plaintiffs knew or understood the Triton investment to

mean that their assets would no longer be under the supervision of Regal. To the contrary, the Complaint repeatedly alleges that Plaintiffs had reason to, and did in fact, believe that Regal would supervise their investment accounts and Mr. Barnes's conduct. (Compl. ¶¶ 28–29, 35, 75–76, 81, 84, 89, 101, 103.) The Court, therefore, denies the Motion as to Plaintiffs' breach of fiduciary duty claim.

C.    **Negligence and Vicarious Liability (Counts II, V, and X)**

45.    The Complaint alleges two separate counts of negligence. The first negligence claim (Count II) alleges that Regal breached its duties to Plaintiffs to act as a reasonable, prudent, and competent investment adviser and to implement and maintain a compliance program by soliciting, selling, advising, and allowing Plaintiffs to invest in Triton. (Compl. 15.) The second negligence claim (Count V) alleges that Regal breached its duty of care in managing Plaintiffs' investment portfolios. (Compl. 18.) At the hearing on the Motion, Plaintiffs' counsel conceded that the two claims were substantially identical, and the Court will therefore treat Plaintiffs' negligence claims as one claim.

46.    To state a claim for negligence, the Complaint "must allege the existence of a legal duty or standard of care owed to the plaintiff by the defendant, breach of that duty, and a causal relationship between the breach of duty and certain actual injury or loss sustained by the plaintiff." *Sterner v. Penn*, 159 N.C. App. 626, 630, 583 S.E.2d 670, 673 (2003) (quotation marks omitted).

47.    Plaintiffs allege that Regal was registered in North Carolina to act as an investment adviser, (Compl. ¶¶ 9–10), and that Mr. Barnes was registered as an

investment adviser representative with Regal at all times relevant to the Complaint, (Compl. ¶ 13). The Complaint alleges that Plaintiffs entered into contracts with Regal whereby Regal agreed to act as Plaintiffs' investment adviser, (Compl. ¶¶ 26–27), and, as such, owed Plaintiffs certain duties as a matter of law, including the duty to implement and maintain a competent compliance program to monitor its investment adviser representative and Plaintiffs' accounts, (Compl. ¶¶ 94–95, 113). The allegations of the Complaint state that Plaintiffs were induced by Mr. Barnes to make risky investments in Triton in the spring of 2014, (Compl. ¶ 44), but that Regal stated in a letter to Plaintiffs that it did not become aware of Mr. Barnes's conduct until around March 2016, (Compl. ¶ 63). The Complaint alleges facts suggesting that Regal should have known of the Triton investment earlier as it could have monitored Mr. Barnes's e-mail account, wire transfers made from Plaintiffs' accounts, or Plaintiffs' investment reports. (Compl. ¶¶ 77, 79–80.) Plaintiffs further allege that it was standard industry practice and a legal requirement for Regal to establish, maintain, and enforce written procedures that require frequent examination of client accounts and prompt review of all correspondence pertaining to the solicitation or execution of advisory transactions, (Compl. ¶ 82), but that Regal failed to monitor its representatives' company e-mails and otherwise failed to monitor Plaintiffs' accounts or the conduct of Mr. Barnes, (Compl. ¶¶ 78, 80). The Complaint alleges that Regal's failure to monitor Plaintiffs' accounts or Mr. Barnes's conduct caused Plaintiffs' loss of their investments in Triton. (Compl. ¶¶ 62, 97, 115.)

48.     Regal argues that the only duties that Regal owes to Plaintiffs arise under the Advisory Agreements and, therefore, Plaintiffs' negligence claims are barred by the economic loss rule.  (Def. Regal's Br. Supp. 8–9.)  Plaintiffs argue that, because Regal owed them separate duties as a fiduciary and under the North Carolina Administrative Code, the economic loss rule does not bar their negligence claims. (Pls.' Br. Opp'n 16.)

49.     North Carolina has adopted the economic loss rule, which bars recovery in tort for purely economic loss arising out of a breach of contract.  *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 639–40, 643 S.E.2d 28, 30–31 (2007). The economic loss rule provides that

> a tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.  It is the law of contract and not the law of negligence which defines the obligations and remedies of the parties in such a situation.

*Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741– 42 (1992) (citations omitted).  A party may bring a negligence claim based on conduct that is also alleged to be a breach of contract where the plaintiff can "identify a duty owed by the defendant separate and distinct from any duty owed under a contract." *Forest2Market, Inc. v. Arcogent, Inc.*, 2016 NCBC LEXIS 3, at *8 (N.C. Super. Ct. Jan. 5, 2016) (quotation marks omitted); *see also Rountree v. Chowan Cty.*, 796 S.E.2d 827, 831 (N.C. Ct. App. 2017) ("[A] viable tort action must be grounded on a violation of a duty imposed by operation of law, and the right invaded must be one that the law

provides without regard to the contractual relationship of the parties." (emphasis omitted)).

50. To support its argument that Regal owed duties to Plaintiffs separate from those arising under the contract, Plaintiffs point to the North Carolina Administrative Code, which provides that "[e]very investment adviser shall exercise diligent supervision over the advisory activities of all of its investment adviser representatives[.]" (Pls.' Br. Opp'n 16 (quoting 18 N.C. Admin. Code 6A .1808(b)).) Plaintiffs also cite to an administrative rule requiring investment advisers (which would by definition include Regal in its relationship with each of the Plaintiffs) to "establish, maintain and enforce written procedures" that require "frequent examination of all client accounts to detect and prevent irregularities or abuses" and "prompt review and written approval by a designated supervisor of all advisory transactions by investment adviser representatives and of all correspondence pertaining to the solicitation or execution of all advisory transactions." (Pls.' Br. Opp'n 16 (citing 18 N.C. Admin. Code 6A .1808(d)(2)–(3)).) These administrative provisions imposing additional duties on investment advisers to supervise client accounts and investment adviser representatives are some support for Plaintiffs' claim that Regal owed them duties beyond those arising under the contracts between them.

51. Therefore, having concluded that Plaintiffs have adequately alleged the existence of a fiduciary relationship and finding that Plaintiffs have offered some support for the proposition that Regal had separate obligations under North

Carolina's regulatory code, the Court cannot conclude, at this early pleading stage, that the economic loss rule bars Plaintiffs' negligence claims as a matter of law.

52.     The Court also notes that Count X of the Complaint alleges *respondeat superior* as a separate claim against Regal.  (Compl. 21.)  Plaintiffs allege that Regal may be liable for Mr. Barnes's negligent conduct, which was alleged to be within the scope of his employment with Regal and in furtherance of Regal's business.  (Compl. ¶¶ 139–40.)

53.     Regal argues that it cannot be held vicariously liable under the doctrine of *respondeat superior* for Mr. Barnes's actions because the Complaint demonstrates that Mr. Barnes's conduct was outside the scope of his authority, as Mr. Barnes was only authorized to manage Plaintiffs' portfolios using investments that had been approved by Regal's officers and investment committee.  (Def. Regal's Br. Supp. 19; Def. Regal's Br. Supp. Ex. A., Part VIII, ECF No. 30.2.)  Regal further argues that, because Plaintiffs allege that the Triton investment was not an authorized investment, Mr. Barnes was acting outside the scope of his authority and, as such, Regal may not be liable for Mr. Barnes's conduct regarding the Triton investment. (Def. Regal's Br. Supp. 19.)  Plaintiffs argue that Mr. Barnes's conduct, although not expressly authorized by Regal, was within the scope of his employment because he was advising clients on the propriety of making an investment—the exact activity he was hired by Regal to perform.  (Pls.' Br. Opp'n 24–25.)

54.     "When an employee commits a tort while acting within the scope of his employment, the tort can be imputed to the employer under the doctrine of *respondeat*

*superior.*" *Estate of Redding v. Welborn*, 170 N.C. App. 324, 330, 612 S.E.2d 664, 668 (2005). "It is elementary that the principal is liable for the acts of his agent, whether malicious or negligent, . . . when the agent or servant is acting within the line of his duty and exercising the functions of his employment." *White*, 166 N.C. App. at 297, 603 S.E.2d at 157 (quoting *Thrower v. Coble Dairy Prods. Coop., Inc.*, 249 N.C. 109, 111–12, 105 S.E.2d 428, 430 (1958)). Thus, "the critical question is whether the tort was committed in the course of activities that the employee was authorized to perform." *Id.* at 298, 603 S.E.2d at 158.

55. Here, Mr. Barnes was Regal's investment adviser representative. (Compl. ¶ 13.) According to Regal's own Policy Statement, "[i]nvestment advisors [sic] representatives are a critical component of the Regal Investment Advisors wealth management process. They are responsible for selecting the appropriate portfolio model . . . [and] are also relied upon to review with each client the investment process and results on an ongoing basis." (Compl. Ex. B, Part III.) Advising clients on the suitability of investments was, therefore, within the course of activities that Mr. Barnes was authorized to perform. The allegations of the Complaint, at this preliminary stage of the proceeding, adequately allege that Mr. Barnes was acting within the scope of his authority in advising Plaintiffs on how to invest their assets. Therefore, the Court cannot conclude that Mr. Barnes was acting outside the scope of his authority so as to defeat Plaintiffs' vicarious liability theory of recovery.

56. The Court concludes that Plaintiffs have adequately stated a claim against Regal for negligence based on Regal's own conduct and, based on a theory of vicarious

liability, for the negligent conduct of Mr. Barnes. The Motion is, therefore, denied as to Plaintiffs' negligence claims.

### D. Negligent Misrepresentation (Count IV)

57. "The tort of negligent misrepresentation occurs when a party justifiably relies to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Rountree*, 796 S.E.2d at 830 (quotation marks omitted). Under well-settled North Carolina law,

> [a] breach of duty that gives rise to a claim of negligent misrepresentation has been defined as:
>
> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, [and thus] is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* at 831 (second alteration in original) (quoting *Simms v. Prudential Life Ins. Co. of Am.*, 140 N.C. App. 529, 534, 537 S.E.2d 237, 241 (2000)). In addition, a claim for negligent misrepresentation must be based on an affirmative misrepresentation, not on a failure to disclose information. *See Harrold v. Dowd*, 149 N.C. App. 777, 783, 561 S.E.2d 914, 919 (2002) (affirming dismissal of negligent misrepresentation claim where the complaint alleged that defendants failed to provide information or advise plaintiffs); *DeGorter v. Capitol Wealth, Inc.*, 2016 NCBC LEXIS 44, at *26 n.2 (N.C. Super. Ct. May 31, 2016) (stating that negligent omissions cannot serve as a basis for a negligent misrepresentation claim under North Carolina law); *Loftin v. QA Invs. LLC*, 2015 NCBC LEXIS 44, at *27 (N.C. Super. Ct. Apr. 30, 2015) (citing *Harrold*).

Finally, reliance on the negligently prepared information must be justifiable. *Rountree*, 796 S.E.2d at 830. Justifiable reliance is analogous to reasonable reliance in fraud actions. *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 224, 513 S.E.2d 320, 327 (1999). "Reliance is not reasonable if a plaintiff fails to make any independent investigation, or fails to demonstrate he was prevented from doing so." *Arnesen v. Rivers Edge Golf Club & Plantation, Inc.*, 368 N.C. 440, 449, 781 S.E.2d 1, 9 (2015) (citations and quotation marks omitted). "[T]o establish justifiable reliance a plaintiff must sufficiently allege that he made a reasonable inquiry into the misrepresentation and allege that he was denied the opportunity to investigate or that he could not have learned the true facts by exercise of reasonable diligence." *Rountree*, 796 S.E.2d at 833 (quoting *Arnesen*, 368 N.C. at 454, 781 S.E.2d at 11). "Whether a party's reliance is justified is generally a question for the jury, except in instances in which the facts are so clear as to permit only one conclusion." *Dallaire v. Bank of Am., N.A.*, 367 N.C. 363, 369, 760 S.E.2d 263, 267 (2014) (quotation marks omitted).

58. Regal contends that Plaintiffs' negligent misrepresentation claim must fail because Plaintiffs have not adequately alleged (1) that Regal owed Plaintiffs a duty of care independent of the duties owed under the contract, (2) that Regal made any misrepresentations to Plaintiffs, or (3) that Plaintiffs justifiably relied on any misrepresentations. (Def. Regal's Br. Supp. 10–11.)

59. As to Regal's first argument, the Court has already concluded that Plaintiffs have sufficiently alleged that Regal owed Plaintiffs duties, separate and

distinct from those under the contract, as a fiduciary and/or pursuant to North Carolina's administrative rules governing investment advisers. Likewise, as to Regal's second argument, Plaintiffs' negligent misrepresentation claim is based on alleged misrepresentations made by Mr. Barnes, and, as discussed above, the Court has concluded that Plaintiffs have alleged an adequate basis for vicarious liability.

60. As to Regal's third and final argument, Plaintiffs respond that they did make inquiries about the Triton investment, (Pls.' Br. Opp'n 19); however, the Court notes that the allegations of the Complaint state that Plaintiffs limited their investigation to asking Mr. Barnes about the Triton investment, (Compl. ¶¶ 50–54). Additionally, Plaintiffs do not dispute that they failed to allege facts demonstrating that they were denied an opportunity to investigate or would have been unable to discover information about Triton through the exercise of reasonable diligence. Instead, Plaintiffs argue that it would be "ludicrous" to charge them with a duty to inquire into the veracity of Mr. Barnes's claims as to all of the investments they made with Mr. Barnes because Mr. Barnes had superior knowledge and was their trusted advisor. (Pls.' Br. Opp'n 19.)

61. Our Court of Appeals has previously held that a plaintiff may justifiably rely on representations made by a defendant with superior knowledge on a subject where the parties are not on equal footing and nothing about the defendant's representations should have given plaintiff cause to suspect the veracity of the representations. *Walker v. Town of Stoneville*, 211 N.C. App. 24, 34, 712 S.E.2d 239, 246 (2011) ("Where the parties are not on equal footing, and the defendant who

possesses superior knowledge and/or experience makes a representation 'containing nothing so improbable or unreasonable as to give him cause to suspect that it is false, and an investigation would be necessary for him to discover the truth, the statement may be relied on.'" (quoting *White Sewing Mach. Co. v. Bullock*, 161 N.C. 1, 8, 76 S.E. 634, 637 (1912))).

62. Having already found that Plaintiffs adequately allege the existence of a fiduciary relationship, the Court concludes that Plaintiffs have also alleged that Plaintiff was not on equal footing with Regal and Mr. Barnes, as Defendants had superior knowledge concerning the advisability of specific investments. Additionally, the Complaint is devoid of facts that would require the Court to conclude that Plaintiffs should have been put on notice that Mr. Barnes's representations should not have been relied upon. To the contrary, the Complaint alleges that Mr. Barnes had many years of experience as an investment adviser representative and there is no indication he previously misadvised his clients. (*See* Compl. ¶¶ 21–23, 41.) The Complaint further alleges that Plaintiffs had no reason to suspect that Mr. Barnes had implemented "a reckless and unsuitable investment strategy" until two years after Plaintiffs relied on Mr. Barnes's representations. (Compl. ¶ 66.)

63. At this preliminary stage, the Court cannot conclude, as a matter of law, that the facts alleged permit the sole conclusion that Plaintiffs' reliance was not justified. *See Dallaire*, 367 N.C. at 369, 760 S.E.2d at 267. The Motion is, therefore, denied as to Plaintiffs' negligent misrepresentation claim.

## E. Negligent Supervision (Count XI)

64. "North Carolina recognizes a cause of action for negligent supervision and retention as an independent tort based on the employer's liability to third parties." *Smith v. Privette*, 128 N.C. App. 490, 494, 495 S.E.2d 395, 398 (1998). A claim for negligent supervision requires plaintiff to allege:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision[;] . . . and (4) that the injury complained of resulted from the incompetency proved.

*Medlin v. Bass*, 327 N.C. 587, 590–91, 398 S.E.2d 460, 462 (1990) (emphasis and quotation marks omitted) (omissions in original). Thus, "[t]o support a claim of negligent retention and supervision against an employer, the plaintiff must prove that the incompetent employee committed a tortious act resulting in injury to plaintiff and that *prior to the act*, the employer knew or had reason to know of the employee's incompetency." *Wilkerson v. Duke Univ.*, 229 N.C. App. 670, 677, 748 S.E.2d 154, 160 (2013) (emphasis added).

65. Regal argues that Plaintiffs have not alleged facts showing that Mr. Barnes was incompetent or that Regal had any reason to know of Mr. Barnes's alleged incompetence prior to the Triton investment. (Def. Regal's Reply Br. 8.) At the hearing, Plaintiffs' counsel argued that Mr. Barnes's conduct in advising clients to invest in a company that he knew was under severe financial distress rendered him an incompetent employee. Plaintiffs' counsel argued that in *White*, as in this case,

the allegations were that defendant-company should have realized through proper supervision that an employee was engaging in wrongful activity with client accounts, which conduct made the employee incompetent.

66. The Court disagrees with Plaintiffs' reading of *White*, which the Court finds clearly distinguishable. In *White*, defendant's employee began systematically converting plaintiffs' assets in 1995. *White*, 166 N.C. App at 288, 603 S.E.2d at 152. In reversing the dismissal of plaintiffs' negligent hiring claim, the Court of Appeals noted that the complaint alleged that the employee had been engaging in similar illegal activity since about 1992, resulting in his termination from his prior employer. *Id.* at 292, 603 S.E.2d at 155. Therefore, the Court of Appeals concluded that plaintiffs adequately alleged that defendant knew or had reason to know of its employee's incompetence prior to the tortious conduct that harmed plaintiffs.

67. The same cannot be said here. The Complaint is devoid of allegations that Regal knew or should have known that Mr. Barnes was incompetent either through inherent unfitness or prior specific tortious acts. To the contrary, the Complaint alleges that most Plaintiffs had a business relationship with Mr. Barnes prior to his joining Regal and had come to trust and rely on his financial advice. (Compl. ¶¶ 21, 41.) The Complaint alleges that Mr. Barnes worked as a registered investment adviser with various firms since the 1980s, working at his previous firm for nine years before joining Regal. (Compl. ¶¶ 22–23, 25.) Nothing in the Complaint suggests that Mr. Barnes had previously handled client accounts negligently or inappropriately. Even assuming that Mr. Barnes's poor advice regarding the Triton investment

rendered him inherently unfit to act as an investment adviser representative, taking the factual allegations of the Complaint as true and construing them in the light most favorable to Plaintiffs, the Complaint fails to allege that Regal knew or should have known of Mr. Barnes's unfitness prior to the Triton investment.

68. At the hearing, Plaintiffs' counsel represented that the negligent supervision claim was brought as both a common law claim and a statutory claim pursuant to the North Carolina Administrative Code provision that provides that investment advisers are responsible for the acts, practices, and conduct of their investment adviser representatives. *See* 18 N.C. Admin Code. 6A .1808(a). However, the Court is not aware of any North Carolina law under which this regulatory code provision creates a private cause of action. *Cf. Time Warner Entm't Advance/Newhouse P'ship v. Town of Landis*, 228 N.C. App. 510, 516, 747 S.E.2d 610, 615 (2013) ("[A] statute allows for a private cause of action only where the legislature has expressly provided a private cause of action within the statute.").

69. As Plaintiffs have not alleged that Mr. Barnes was incompetent or that Regal should have known of such alleged incompetence prior to the Triton investment, the Court concludes that Plaintiffs have failed to state a claim for negligent supervision. Therefore, the Motion is granted as to Plaintiffs' negligent supervision claim, and this claim is dismissed without prejudice.

F. **NCSA Claims (Counts VI and VII)**

70. The NCSA creates a private cause of action that is complementary to that created by federal securities laws. *Piazza v. Kirkbride*, 785 S.E.2d 695, 707 (N.C. Ct.

App. 2016). Because there is limited North Carolina case law interpreting the NCSA, the Court may properly look to the federal courts' construction of parallel federal statutes in its interpretation of the NCSA. *Id.* at 708; *NNN Durham Office Portfolio 1, LLC v. Grubb & Ellis Co.*, 2016 NCBC LEXIS 95, at *78–79 (N.C. Super. Ct. Dec. 5, 2016).

71. Plaintiffs bring two claims under Article 7 of the NCSA. (Compl. 18–19.) Article 7 of the NCSA provides for civil liability that may be "primary" or "secondary." N.C. Gen. Stat. § 78A-56(a)(1)–(2), (c); *see also Piazza*, 785 S.E.2d at 708. The relevant portions of the NCSA's primary liability provision provide that:

> (a) Any person who:
>
> > (1) Offers or sells a security in violation of [N.C. Gen. Stat. §] 78A-8(1), 78A-8(3) [provisions relating to fraud or deceit], . . . , or
> >
> > (2) Offers or sells a security by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of the untruth or omission), and who does not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of the untruth or omission
>
> is liable to the person purchasing the security from him[.]

N.C. Gen. Stat. § 78A-56(a). The relevant portion of the NCSA that creates secondary, or "control person," liability provides that:

> (c)(1) Every person who directly or indirectly controls a person liable under subsection (a) . . . of this section, every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the sale is also liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person

did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C. Gen. Stat. § 78A-56(c)(1).

### 1.    Primary Liability Under N.C. Gen. Stat. § 78A-56(a)(2)

72.    As an initial matter, Regal argues that Plaintiffs' primary liability claims under the NCSA and the NCIAA are barred by the economic loss rule because they are in essence common law fraud claims.  (Def. Regal's Br. Supp. 7.)  However, the Court observes that Plaintiffs have not brought any common law fraud claims. Additionally, the economic loss rule is limited to barring only negligence claims, not all tort actions. *Bradley Woodcraft, Inc. v. Bodden*, 795 S.E.2d 253, 258 (N.C. Ct. App. 2016); *see also Jones v. Harrelson & Smith Contractors, LLC*, 194 N.C. App. 203, 215, 670 S.E.2d 242, 250 (2008) ("[A] plaintiff may assert both [fraud and breach of contract] claims, although she may be required to elect between her remedies prior to obtaining a verdict.").  Therefore, if Plaintiffs' claims are, at least in part, grounded in fraud, then the economic loss rule does not act to bar them. *Bradley Woodcraft, Inc.*, 795 S.E.2d at 258.  Second, Plaintiffs' primary liability claims under the NCSA and the NCIAA are statutory, not contractual, as Plaintiffs seek to hold Regal liable for violating duties created by statute, not by common law or by the terms of the parties' Advisory Agreements.  The economic loss rule does not, therefore, bar Plaintiffs' claims that Regal is subject to primary liability under the NCSA or the NCIAA.

73. "The NCSA contains two antifraud provisions that impose primary liability on 'any person' for (1) fraud, or (2) materially false statements or omissions made in connection with an offer or sale of a security." *Piazza*, 785 S.E.2d at 708 (citing N.C. Gen. Stat. § 78A-56(a)). Our Court of Appeals has considered the pleading standards and requirements of proof under § 78A-56(a). *Id.* The Court noted that § 78A-56(a)(1) makes actionable the prohibitions stated in § 78A-8(a)(1) and (3) of the NCSA, which prohibit fraud in connection with the offer, sale, or purchase of any security, directly or indirectly. *Id.*; *see also* N.C. Gen. Stat. § 78A-8(1) (prohibiting the use of "any device, scheme, or artifice to defraud"); N.C. Gen. Stat. § 78A-8(3) (prohibiting "any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person"). The Court of Appeals stated that § 78A-56(a)(1) imposes liability similar to common law fraud and is comparable to federal actions under Rule 10b-5 of Section 10(b) of the Securities Exchange Act of 1934. *Piazza*, 785 S.E.2d at 709 (citing 17 C.F.R. 240.10b-5). Based on the foregoing, the Court of Appeals concluded that claims brought under § 78A-56(a)(1), being comparable to common law fraud claims, require proof of *scienter* and justifiable reliance. *Id.*

74. The Court of Appeals then turned to the second primary liability provision, which is applicable to any untrue statement of material fact or any omission to state a material fact necessary to make a previous statement not misleading. *Id.* (citing N.C. Gen. Stat. § 78A-56(a)(2)). The Court stated that a claim under § 78A-56(a)(2) is the equivalent under North Carolina law of a claim under section 12(a)(2) of the Securities Act of 1933. *Id.* at 709–10. The Court concluded that § 78A-56(a)(2) is

more akin to a negligence standard than intentional fraud and held that a plaintiff alleging a § 78A-56(a)(2) claim need not prove *scienter*.  *Id.* at 710–11.  Additionally, claims brought under this section do not require a plaintiff to prove justifiable reliance.  *NNN Durham Office Portfolio 1, LLC v. Highwoods Realty Ltd. P'ship*, 2013 NCBC LEXIS 11, at \*38 (N.C. Super. Ct. Feb. 19, 2013).  However, this Court has held that, while § 78A-56(a)(2) claims do not require proof of *scienter* or justifiable reliance, or that plaintiffs satisfy the heightened pleading requirements of Rule 9(b), liability is limited to false or misleading statements which are material and does not include a failure to disclose information where such a duty does not otherwise exist. *Id.* (noting that this section "does not on its own alter the general rule which imposes no general duty of disclosure in commercial real estate transactions").

> In sum, the elements of a claim under § 56(a)(2) include: (1) a statement which was false or misleading, or which under the circumstances was false or misleading because of the omission of other facts (the purchaser not knowing of the untruth or omission); (2) that such statement was material; and (3) that such statement was made by one who offered or sold a security.  The offeror or seller may escape liability for such a false or misleading statement if he can show that he did not know and in the exercise of reasonable diligence could not have known that the statement was false or misleading.

*Id.* at \*38–39.

75.    Plaintiffs allege that Regal is subject to primary liability for Mr. Barnes's false or misleading statements made in connection with the Triton investment. (Compl. ¶¶ 117–20.)  Regal argues that Plaintiffs' claim that Regal is subject to primary liability under the NCSA must be dismissed because Plaintiffs have not sufficiently alleged that (1) Regal sold or offered to sell securities to Plaintiffs or (2)

Regal made any false statement or omission of material fact. (Def. Regal's Br. Supp. 12.)

76. Regal first argues that the securities were allegedly offered and sold to Plaintiffs entirely by Mr. Barnes *after* Plaintiffs had transferred their assets out of their Regal accounts and into self-directed IRAs. (Def. Regal's Br. Supp. 12; *see also* Compl. ¶ 42f.) Plaintiffs respond that Mr. Barnes acted as Regal's agent and investment adviser representative when he solicited Plaintiffs to invest in Triton and transferred Plaintiffs' assets held by Regal to the Triton investment. (Pls.' Br. Opp'n 27.)

77. Contrary to Regal's argument that Mr. Barnes offered securities to Plaintiffs after they had transferred their assets from Regal accounts, Plaintiffs allege that Mr. Barnes contacted them and made misrepresentations about the Triton investment while their assets were still held in Regal accounts. (Compl. ¶¶ 42–43.) The Complaint further alleges that Plaintiffs invested in Triton after and based on Mr. Barnes's alleged omissions or false statements. (Compl. ¶ 44.) This is sufficient to allege that Mr. Barnes offered securities to Plaintiffs while their assets were still in Regal accounts.

78. As to Regal's argument that Plaintiffs' primary liability claim should be dismissed where Plaintiffs have not alleged that Regal itself made any untrue statement or omission of material fact, Regal points to several Business Court decisions wherein claims for primary liability were dismissed against persons or entities that did not themselves make any statement or omission regarding the offer

or sale of securities. (Def. Regal's Br. Supp. 12–13 (citing *NNN Durham Office Portfolio 1*, 2016 NCBC LEXIS 95, at *75; *Atkinson v. Lackey*, 2015 NCBC LEXIS 21, at *22–26 (N.C. Super. Ct. Feb. 27, 2015)).) In *NNN Durham*, the Court concluded that there was no basis to impose primary liability on a parent company whose subsidiaries made misrepresentations in connection with the sale of securities where there was no evidence that the parent offered or sold a security, made any statements to plaintiffs, entered into contracts with plaintiffs, or shared contractual privity with plaintiffs. *NNN Durham Office Portfolio 1*, 2016 NCBC LEXIS 95, at *73–75. In *Atkinson*, the Court dismissed claims for primary liability against two managers of an LLC where there was no evidence that either of them offered or sold a security or made any statements to plaintiffs. *Atkinson*, 2015 NCBC LEXIS 21, at *23–25.

79. Plaintiffs argue that *NNN Durham* and *Atkinson* are distinguishable because the business relationship between the party held not to be primarily liable for the statements or omissions of another did not have a strong regulatory connection to, and supervisory duties over, the party who made the statement or omission. (Pls.' Br. Opp'n 26.) Plaintiffs again point to the administrative rule stating that investment advisers are responsible for the acts, practices, and conduct of their investment adviser representatives. (Pls.' Br. Opp'n 26 (citing 18 N.C. Admin. Code 6A .1808(a)).) Although the Court considers rules adopted by the Secretary of State, as administrator of the NCSA, as some indication of how the statute should be interpreted, Plaintiffs have not provided, and the Court cannot find, any reasoned basis for concluding that this rule is meant to impose primary liability under Article

7 of the NCSA on investment advisers in a private civil suit. When considered in light of the fact that the NCSA specifically provides for secondary "control person" liability for parties who did not themselves make untrue statements but had the ability to control a person who did, the Court declines to hold that Regal may be primarily liable where there is no allegation it made any false or misleading statement.

80.    Because Plaintiffs have not alleged that Regal made any false or misleading statement, the Court concludes that Plaintiffs have not stated a claim for primary liability against Regal under § 78A-56(a)(2) of the NCSA.

## 2.    Control Person Liability Under N.C. Gen. Stat. § 78A-56(c)(1)

81.    For Plaintiffs to bring a claim for secondary ("control person") liability under § 78A-56(c)(1), they must first plead a primary violation under § 78A-56(a)–(b1). *NNN Durham Office Portfolio 1, LLC*, 2013 NCBC LEXIS 11, at \*41. In addition, "a plaintiff must prove that the defendant fits within the category of persons specified in § 56(c)(1)," *id.* at \*49, which includes "[e]very person who directly or indirectly controls a person liable under subsection (a), (b), or (b1) of this section," N.C. Gen. Stat. § 76A-56(c)(1).

82.    Regal does not argue that Plaintiffs have not adequately alleged that Mr. Barnes committed a primary violation, but instead argues that Plaintiffs have failed to sufficiently allege that Regal had control over Mr. Barnes when he made the alleged misrepresentations to Plaintiffs. (Def. Regal's Br. Supp. 17.) Regal argues that for control person liability to attach, "the control person needs to have actually

exercised general control over the operations of the wrongdoer, and . . . must have had the power or ability – even if not exercised – to control the specific transaction or activity that is alleged to give rise to lability." (Def. Regal's Br. Supp. 17 (quotation marks omitted) (quoting *Atkinson*, 2015 NCBC LEXIS 21, at *31).) Regal also points to language from a Fourth Circuit opinion that was quoted in *Atkinson* and states that "[t]he controlling persons provisions contain a state-of-mind condition that requires a showing of something more than negligence to establish liability." (Def. Regal's Br. Supp. 18 (alteration in original) (quoting *Carpenter v. Harris, Upham & Co.*, 594 F.2d 388, 394 (4th Cir. 1979)).)

83.     The Court initially notes that the proposition that Plaintiffs must show more than negligence to establish control person liability is not clearly established under federal law, but is, in fact, the subject of a circuit split. *Lustgraaf v. Behrens*, 619 F.3d 867, 877 (8th Cir. 2010) (noting that whether control person liability requires culpable participation has created a circuit split and collecting cases). More importantly, the *Atkinson* opinion first considered whether the complaint adequately stated a claim for control person liability and then whether that claim survived summary judgment. *Atkinson*, 2015 NCBC LEXIS 21, at *27–32. The quoted language was discussed in relation to the motion for summary judgment, the court having found that plaintiffs adequately alleged control person liability under the liberal pleading standard. *Id.* at *27–28, *31–32.

84.     Here, Plaintiffs allege that Mr. Barnes was an employee of Regal. (Compl. ¶ 25.) Plaintiffs further point to Regal's legal obligation to supervise its investment

adviser representatives as support for the argument that Regal did in fact have the ability to control Mr. Barnes's conduct. (Pls.' Br. Opp'n 32 (citing 18 N.C. Admin. Code 6A .1808).) Additionally, the Complaint alleges that Mr. Barnes used a Regal e-mail account in discussing the Triton investment with Plaintiffs, an account which Plaintiffs allege Regal could have and should have monitored. (Compl. ¶¶ 77–78.) Plaintiffs also allege that Regal had the ability to review wire transfers from Mr. Barnes's client accounts and to review the investment reports of clients for whom Mr. Barnes was the investment adviser representative. (Compl. ¶¶ 79–80.) Additionally, the fact that Regal later terminated Mr. Barnes for conduct he engaged in as an investment adviser representative of Regal further supports the argument that Regal had the ability to control Mr. Barnes's conduct. (Compl. ¶ 63.)

85. Taking all facts and inferences in the light most favorable to Plaintiffs, the Court concludes that the allegations are sufficient to state that Regal exercised general control over Mr. Barnes's investment advising activity and had the power or ability to control Mr. Barnes's conduct regarding his solicitation of Plaintiffs for the Triton investment. Based on the foregoing, the Court concludes that Plaintiffs have stated a claim against Regal for control person liability under the NCSA and, as such, the Motion is denied as to this claim.

G. **NCIAA Claims (Counts VIII and IX)**

86. The NCIAA, like the NCSA, creates a private cause of action against persons who commit primary violations of the NCIAA and for persons who are liable as control persons. N.C. Gen. Stat. § 78C-38(a)–(b). The primary liability provision

states in pertinent part:

(a) Any person who:

(1) Engages in the business of advising others, for compensation, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as a part of a regular business, issues or promulgates analyses or reports concerning securities, in violation of [N.C. Gen. Stat. §] 78C-8(b), . . . or

(2) Receives, directly or indirectly, any consideration from another person for advice as to the value of securities or their purchase or sale, whether through the issuance of analyses, reports or otherwise and employs any device, scheme, or artifice to defraud such other person or engages in any act, practice or course of business which operates or would operate as a fraud or deceit on such other person in violation of [N.C. Gen. Stat. §] 78C-8(a)(1) or (2),

is liable to any person who is given such advice in such violation[.]

N.C. Gen. Stat. § 78C-38(a).

87. The secondary liability provision provides in relevant part that:

(b)(1) Every person who directly or indirectly controls a person liable under subsection (a) of this section, including every partner, officer, or director of the person, every person occupying a similar status or performing similar functions, and every dealer or salesman who materially aids in the conduct giving rise to the liability is liable jointly and severally with and to the same extent as the person, unless able to sustain the burden of proof that the person did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

N.C. Gen. Stat. § 78C-38(b)(1).

### 1. Primary Liability Under N.C. Gen. Stat. §§ 78C-8, -38

88. Plaintiffs' Complaint appears to allege that Regal and Mr. Barnes are subject to primary liability under § 78C-38(a)(1)–(2). The claim under § 78C-38(a)(1)

alleges that Defendants are liable for making untrue statements of material fact, or for making misleading statements by omitting material facts, in connection with the Triton investment. (Compl. ¶ 128.) Plaintiffs' claim under § 78C-38(a)(2) alleges that Defendants engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon Plaintiffs. (Compl. ¶ 129.)

89. Having concluded that Plaintiffs have failed to state a primary liability claim under the NCSA because there is no allegation that Regal itself made any false or misleading statements regarding the Triton investment, the Court likewise concludes that Plaintiffs have failed to state a primary liability claim under the NCIAA. The Court further concludes that Plaintiffs' conclusory allegation that Regal engaged in acts, practices, or courses of business that operated as a fraud or deceit on Plaintiffs is insufficient to state a claim that Regal has committed a primary violation of the NCIAA.

90. The Motion is therefore granted as to Plaintiffs' claim against Regal for primary violations of the NCIAA and this claim is dismissed without prejudice.

### 2. Control Person Liability Under N.C. Gen. Stat. § 78C-38

91. Neither Regal nor Plaintiffs make any distinction between their control person liability argument as to the NCSA and the NCIAA. (Def. Regal's Br. Supp. 16–18; Pls.' Br. Opp'n 29–33.) The Court therefore concludes that Plaintiffs have stated a claim under the NCIAA for control person liability against Regal for the same reasons the Court so concludes with respect to Plaintiffs' claim for control person liability under the NCSA, and the Motion is denied as to this claim.

## V. CONCLUSION

92. For the foregoing reasons, the Court **GRANTS in part** and **DENIES in part** Defendant Regal's Motion as follows:

    A.    The Court **DENIES** the Motion as to Plaintiffs' breach of contract claim.

    B.    The Court **DENIES** the Motion as to Plaintiffs' breach of fiduciary duty claim.

    C.    The Court **DENIES** the Motion as to Plaintiffs' negligence claims.

    D.    The Court **DENIES** the Motion as to Plaintiffs' negligent misrepresentation claim.

    E.    The Court **GRANTS** the Motion as to Plaintiffs' negligent supervision claim, and such claim is dismissed without prejudice.

    F.    The Court **GRANTS** the Motion as to Plaintiffs' claim that Regal is subject to primary liability under the NCSA, N.C. Gen. Stat. § 78A-56(a)(2), and such claim is dismissed without prejudice.

    G.    The Court **DENIES** the Motion as to Plaintiffs' claim that Regal is subject to control person liability under the NCSA, N.C. Gen. Stat. § 78A-56(c)(1).

    H.    The Court **GRANTS** the Motion as to Plaintiffs' claim that Regal is subject to primary liability under the NCIAA, N.C. Gen. Stat. §§ 78C-8, 78C-38(a), and such claim is dismissed without prejudice.

I.    The Court **DENIES** the Motion as to Plaintiffs' claim that Regal is

subject to control person liability under the NCIAA, N.C. Gen. Stat.

§ 78C-38(b)(1).

**SO ORDERED**, this the 8th day of January, 2018.


/s/ Michael L. Robinson
_____
Michael L. Robinson
Special Superior Court Judge
  for Complex Business Cases